## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

KIM TEEL,                                        Case No. 1:10-cv-613
      Plaintiff                           Beckwith, J.
                                                 Litkovitz, M.J.

    vs


COMMISSIONER OF                                  **REPORT AND**
SOCIAL SECURITY,                                 **RECOMMENDATION**
      Defendant


      Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications

for disability insurance benefits (DIB) and supplemental security income (SSI). This matter is

before the Court on plaintiff's Statement of Errors (Doc. 13), the Commissioner's response in

opposition (Doc. 19), and plaintiff's reply memorandum. (Doc. 23).

### PROCEDURAL BACKGROUND

      Plaintiff was born in 1961 and was 48 years old at the time of the decision of the

administrative law judge (ALJ). Plaintiff has a high school education and completed some

college course work. She has past relevant work experience as a clerk cashier, a printing

company feeder, a machine packager, a hand packager, and a cleaner/housekeeper.

      Plaintiff filed applications for DIB and SSI on September 5, 2007, alleging a disability

onset date of August 24, 2007, due to depression, arthritis and carpal tunnel syndrome. (Tr. 126-

35; 153). Plaintiff's applications were denied initially and upon reconsideration. (Tr. 70-79).

Plaintiff requested and was granted a de novo hearing before an ALJ. On February 9, 2010,

plaintiff, who was represented by counsel, appeared and testified at a hearing before ALJ Larry

A. Temin. (Tr. 27-69). A vocational expert (VE), Robert Breslin, also appeared and testified at the hearing. (Tr. 58-67).

On March 18, 2010, the ALJ issued a decision denying plaintiff's DIB and SSI applications. (Tr. 8-21). The ALJ determined that plaintiff meets the insured status requirements of the Social Security Act through December 31, 2012, and that she has not engaged in substantial gainful activity since August 24, 2007. (Tr. 13). The ALJ found that plaintiff has the following severe impairments: degenerative changes in the right knee, and status post surgery on January 31, 2007; stenosis of the cervical spine; degenerative disc disease of the lumbosacral spine; bilateral carpal tunnel syndrome, status post surgical release on the left; and an affective disorder. (Id.). The ALJ found that plaintiff's alleged hypertension, mild degenerative changes of both hips, hypothyroidism, dyspepsia, and obesity were not "severe" within the meaning of the Social Security Regulations and SSR 96-3p. (Tr. 15-16). The ALJ determined that plaintiff does not have an impairment or combination of impairments that meets or medically equals one of impairments in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 16). According to the ALJ, plaintiff retains the residual functional capacity (RFC) to perform work at the light level of exertion but with the following limitations: She can lift/carry up to 20 pounds occasionally and 10 pounds frequently; she can stand and/or walk no more than six hours in an eight-hour workday; she can only occasionally stoop, kneel, crouch, and climb ramps or stairs; she can never crawl or climb ladders/ropes/scaffolds; she can never operate controls with her right lower extremity or perform other work requiring the forceful use of her right lower extremity; she can never work at unprotected heights or work around hazardous machinery; she is able to remember and carry out only short and simple instructions; she cannot interact with the

2

general public; she cannot interact with coworkers or supervisors more than occasionally; she cannot work at a rapid production-rate pace; the job should not require strict production quotas and more than ordinary and routine changes in work setting or duties; and plaintiff is able to make only simple work-related decisions. (Tr. 17). The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms but that plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms are not credible to the extent they are inconsistent with plaintiff's RFC assessment. (Tr. 18). Relying on the testimony of the VE and information from occupational sources, the ALJ determined that plaintiff is capable of performing her past relevant work as a cleaner/housekeeper as it is generally performed and as it is classified in the Dictionary of Occupational Titles, which is as light, unskilled work. (Tr. 19). The ALJ determined that plaintiff would not be able to perform this job in the manner she previously performed it, since that was medium, unskilled work. (*Id*.). In the alternative, using Medical-Vocational Rule 202.21 as a framework for decision making, and relying on the testimony of the VE, the ALJ determined that there are a significant number of unskilled light and sedentary jobs that exist in the national economy that an individual of plaintiff's age, education, work experience and RFC would be able to perform. (Tr. 19-20). Consequently, the ALJ concluded that plaintiff is not disabled under the Act and is therefore not entitled to disability benefits. (Tr. 21).

Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for DIB, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(1), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes performance of the work previously done,

4

or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments. An impairment can be considered as not severe only if the impairment is a "slight abnormality" which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience. *Farris v. Sec'y of HHS,* 773 F.2d 85, 90 (6th Cir. 1985) (citation omitted). *See also Bowen v. Yuckert,* 482 U.S. 137 (1987). If the individual does not have a severe impairment, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing, 20 C.F.R. Part 404, Subpart P, Appendix 1. The Listing sets forth certain impairments which are presumed to be of sufficient severity to prevent the performance of work. 20 C.F.R. § 404.1525(a). Plaintiff's impairment need not precisely meet the criteria of the Listing in order to obtain benefits. It is sufficient if the impairment is medically equivalent to one in the Listing. 20 C.F.R. § 404.1520(d). To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment. 20 C.F.R. § 404.1526(a). The decision is based solely on the medical evidence, which must be supported by medically

5

acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1526(b). If the impairment meets or equals any within the Listing, the Commissioner renders a finding of disability without consideration of the individual's age, education, and work experience. 20 C.F.R. § 404.1520(d); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528 (6th Cir. 1981). Fourth, if the individual's impairments do not meet or equal any in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1053 (6th Cir. 1983); *Kirk*, 667 F.2d at 529.

Plaintiff has the burden of proof at the first four steps of the sequential evaluation process. *Wilson* v. *Commissioner of Social Security,* 378 F.3d 541, 548 (6th Cir. 2004). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon* v. *Apfel,* 168 F.3d 289, 291 (6th Cir. 1999); *Born* v. *Secretary of Health and Human Servs.,* 923 F.2d 1168, 1173 (6th Cir. 1990). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *Wilson,* 378 F.3d at 548. *See also Richardson* v. *Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir. 1984). Alternatively, in certain instances the

6

Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut

plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *Wilson,* 378 F.3d at

548.

A mental impairment may constitute a disability within the meaning of the Act. *See* 42

U.S.C. § 423(d)(1)(A); § 1382c(a)(3)(A). The sequential evaluation analyses outlined in 20

C.F.R. §§ 416.920 and 416.924 apply to the evaluation of mental impairments. However, the

regulations provide a special procedure for evaluating the severity of a mental impairment at

steps two and three for an adult. 20 C.F.R. § 416.920a. At step two, the ALJ must evaluate the

claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a

"medically determinable mental impairment(s)." *Rabbers v. Commissioner Social Sec. Admin.,*

582 F.3d 647, 653 (6th Cir. 2009) (citing 20 C.F.R. § 404.1520a(b)(1)). If so, the ALJ "must

then rate the degree of functional limitation resulting from the impairment." *Id.* (citing 20 C.F.R.

§ 404.1520a(c)(3)).

The claimant's level of functional limitation is rated in four functional areas, commonly

known as the "B criteria": 1) activities of daily living; 2) social functioning; 3) concentration,

persistence, or pace; and 4) episodes of decompensation. *Id.* (citing 20 C.F.R. pt. 404, Subpt. P,

App. 1, § 12.00 et seq.; *Craft v. Astrue,* 539 F.3d 668, 674 (7th Cir. 2008)). The degree of

limitation in the first three functional areas is rated using the following five-point scale: None,

mild, moderate, marked, and extreme. *Id.* (citing 20 C.F.R. § 404.1520a(c)(4)). The degree of

limitation in the fourth functional area (episodes of decompensation) is rated using a four-point

scale: None, one or two, three, four or more. *Id.* If the ALJ rates the first three functional areas

as "none" or "mild" and the fourth area as "none," the impairment is generally not considered

7

severe and the claimant is conclusively not disabled. *Id.* (citing § 404.1520a(d)(1)). Otherwise, the impairment is considered severe and the ALJ will proceed to step three. *Id.* (citing § 404.1520a(d)(2)).

At step three of the sequential evaluation, an ALJ must determine whether the claimant's impairment "meets or is equivalent in severity to a listed mental disorder." *Id.* A claimant whose impairment meets the requirements of the Listing will be deemed conclusively disabled. *Id.* If the ALJ determines that the claimant has a severe mental impairment that neither meets nor medically equals a listed impairment, the ALJ will then assess the claimant's RFC before completing steps four and five of the sequential evaluation process. *Id.* (citing 20 C.F.R. § 404.1520a(d)(3)).

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters* v. *Comm'r of Soc. Sec.,* 127 F.3d 525, 529-530 (6th Cir. 1997). *See also Harris* v. *Heckler,* 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). Likewise, a treating physician's opinion is entitled to substantially greater weight than the contrary opinion of a nonexamining medical advisor. *Shelman* v. *Heckler,* 821 F.2d 316, 321 (6th Cir. 1987). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 416.927(d)(2); *see also Blakley* v. *Commissioner,*

581 F.3d 399, 406 (6th Cir. 2009); *Wilson,* 378 F.3d at 544. "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker* v. *Shalala,* 40 F.3d 789, 794 (6th Cir. 1994). The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 416.927(d)(2).

If the ALJ does not give the treating source's opinion controlling weight, then the ALJ must consider a number of factors when deciding what weight to give the treating source's opinion. 20 C.F.R. § 416.927(d). These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 416.927(d)(2)(i)(ii); *Wilson,* 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 416.927(d)(3)-(6); *Wilson,* 378 F.3d at 544. The ALJ must likewise apply the factors set forth in § 416.927(d)(3)-(6) when considering the weight to give a medical opinion rendered by a non-treating source. 20 C.F.R. § 416.927(d). When considering the medical specialty of a source, the ALJ must generally give "more weight to the opinion of a specialist about medical

issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 416.927(d)(5).

Pain alone, if the result of a medical impairment, may be severe enough to constitute disability. *Kirk v. Sec. of H.H.S.*, 667 F.2d 524, 538 (6th Cir. 1981). In order to find plaintiff disabled on the basis of pain alone, the Commissioner must first determine whether there is objective medical evidence of an underlying medical condition. If there is, the Commissioner must then determine: (1) whether the objective medical evidence confirms the severity of the pain alleged by plaintiff; or (2) whether the underlying medical impairment is severe enough that it can reasonably be expected to produce the allegedly disabling pain. *Duncan v. Secretary of H.H.S.*, 801 F.2d 847, 852-53 (6th Cir. 1986). In addition to the objective medical evidence, the Commissioner must consider other evidence of pain, such as statements or reports from plaintiff, plaintiff's treating physicians and others about plaintiff's prescribed treatment, daily activities, and efforts to work, as well as statements as to how plaintiff's pain affects her daily activities and ability to work. *Felisky v. Bowen*, 35 F.3d 1027, 1037-38 (6th Cir. 1994) (citing 20 C.F.R. § 404.1529(a)). Specific factors relevant to plaintiff's allegations of pain include her daily activities; the location, duration, frequency and intensity of her pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication plaintiff takes; treatment other than medication plaintiff has received for relief of her pain; any measures plaintiff uses to relieve her pain; and other factors concerning her functional limitations and restrictions due to pain. *Id.*; 20 C.F.R. § 404.1529(a). Although plaintiff is not required to provide "objective evidence of the pain itself" in order to establish that she is disabled, *Duncan,* 801 F.2d. at 853, statements about her pain or other symptoms are not sufficient to prove her

10

disability.  20 C.F.R. § 404.1529(a).  The record must include "medical signs and laboratory findings which show that [plaintiff has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence . . . would lead to a conclusion that [plaintiff is] disabled."  *Id*.

Where the medical evidence is consistent and supports plaintiff's complaints of the existence and severity of pain, the ALJ may not discredit plaintiff's testimony and deny benefits. *King v. Heckler*, 742 F.2d 968, 975 (6th Cir. 1984).  Where, however, there is both substantially conflicting medical evidence as well as substantial evidence supporting a finding of disability, the Commissioner's resolution of the conflict will not be disturbed by the Court. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  In either event, the ALJ must articulate, on the record, his evaluation of the evidence and how it relates to the factors listed above. *Felisky*, 35 F.3d at 1039-41.

## MEDICAL EVIDENCE

### A. Physical Impairments

Primary care physician, Esly Caldwell, M.D., treated plaintiff for back pain, neck pain, hypothyroidism, knee pain, depression, and right foot pain from 2006 through 2007. (Tr. 246-54, 437-42).  An MRI of plaintiff's lumbar spine on December 7, 2007, revealed shallow disc protrusion at L4-5 resulting in contact and possibly slight elevation of the exiting left L-4 nerve root with minor disc bulging; minor disc bulging at L3-4 without neural element contact; and lower lumbar facet arthropathy. (Tr. 249-50).  In 2006, plaintiff complained of severe neck pain and left arm and hand numbness and tingling. (Tr. 251).  An MRI of plaintiff's cervical spine performed on November 24, 2006, revealed focal kyphosis at C5-C6 in conjunction with disc

disease at C5-C6 and C6-C7, which caused moderate to severe spinal stenosis with cord compression; at C5-C6 the central cord was mildly flattened and compressed; at C6-C7, there was left paracentral disc protrusion with annular tear causing cord compression of the left side of the spinal cord with slight flattening of the cord. (Tr. 251-52).

Dr. Caldwell completed a questionnaire for the Social Security Administration in September 2007. (Tr. 246-248). The report is not entirely legible. Dr. Caldwell reported that plaintiff had hyperactivity; she was not sleeping; she suffered from depression; she had a weight gain; she experienced numbness and tingling in her hands; and she had a swollen and painful right knee. Dr. Caldwell described plaintiff as having a low frustration tolerance and difficulty tolerating close supervision. (Tr. 247). Dr. Caldwell reported that plaintiff had been treated for bipolar disorder since 2007; she had right knee symptoms since January 2007; and she had carpal tunnel syndrome since October 2006. (Tr. 248). Dr. Caldwell reported that plaintiff's carpal tunnel syndrome was worse and her right knee was better but still painful.[1] Dr. Caldwell diagnosed plaintiff with bipolar disorder; bilateral carpal tunnel syndrome; arthritis in the right knee; hyperthyroidism; hypertension; and diabetes mellitus. (Tr. 248). Dr. Caldwell opined that plaintiff was unable to work. (Tr. 247).

An EMG of plaintiff's left hand performed on October 30, 2006, suggested chronic cervicular radiculopathy. (Tr. 253-54). The findings were consistent with a moderate to severe degree of carpal tunnel syndrome.

On January 19, 2007, plaintiff was seen by Lisa Vickers, M.D., at Ohio Valley

---

[1] Dr. Caldwell also reported on how plaintiff's bipolar disorder and cervical spine had responded to treatment, but her notations are illegible.

12

Orthopedics for pain and swelling in her right knee which had been occurring intermittently for more than one year. (Tr. 470). Examination of the right knee revealed a painful pop with McMurray's testing and tenderness over the anterior lateral joint line. An MRI scan revealed a right knee lateral meniscus tear. (Tr. 473-74). Dr. Vickers performed a right knee arthroscopy with partial lateral meniscectomy on January 31, 2007. (Tr. 471-72). On February 21, 2007, plaintiff reported at her first postoperative visit that she was still having some pain. (Tr. 469). She was out of Vicodin and stated that ibuprofen was not helping. Examination showed her portals were well-healed, and there was no swelling or effusion. Plaintiff's range of motion was full, but she complained of pain throughout the range of motion. She also had weakness and possibly some quadriceps inhibition. Dr. Vickers changed plaintiff's ibuprofen to Naprosyn and referred her to physical therapy with a return visit scheduled in four weeks, at which time Dr. Vickers anticipated releasing plaintiff to return to work. (*Id.*). In April 2007, plaintiff was discharged from physical therapy due to non-compliance with treatment after showing for only three of 12 visits. (Tr. 475).

Dr. Richard Sheridan, M.D., a medical consultant, examined plaintiff on October 30, 2007. (Tr. 233-39). He reported that plaintiff's chief complaint was "trouble with her hands and right knee." (Tr. 233). Plaintiff reported a history of intermittent pain and paresthesias in both wrists; nocturnal awakening and shaking of both hands; and intermittent pain and popping and cracking in her right knee, with difficulty sitting for long periods of time and going up and down steps due to the pain. (*Id.*). Dr. Sheridan observed that plaintiff had a normal gait and she did not use an ambulatory aid. She could get out of chair and onto and off of the exam table independently, and toe and heel walking were symmetric. (Tr. 234). She had symmetric

13

manipulation, pinch, and fine coordination in the hands.  Grip strength was normal on the right and weaker on the left.  Tinel's signs and Phalen signs were both negative for carpal tunnel syndrome.  She had hypesthesia of the left upper and lower extremities and left side of her face on pinwheel pinprick testing.  (Tr. 235).  Plaintiff had full motor strength in her extremities and full range of motion in all areas tested, including in her fingers, thumbs, wrists and knees.  There were no motor deficits in upper and lower extremity motor groups tested.  There was no muscle spasm; the Romberg test was normal; and straight leg raising testing was negative.  (Tr. 235-37).  Dr. Sheridan diagnosed plaintiff with status post right lateral meniscectomy and "alleged" bilateral carpal tunnel syndromes, noting that he did not have the results of her EMG and the nerve conduction study of her left upper extremity.  (Tr. 239).  Dr. Sheridan opined that, presuming plaintiff had this condition, her RFC would be limited to "sit-down work, lifting no greater than 10 lbs. with [no exposure] to temperature extremes and no rapid manual work with either hand."  (*Id.*).

On November 15, 2007, state agency consultant Dr. W. Jerry McCloud, M.D., reviewed the file and completed an RFC assessment.  (Tr. 275-82).  Dr. McCloud opined that plaintiff could lift/carry up to 50 pounds occasionally and 25 pounds frequently; stand/walk 6 hours in an 8-hour workday; sit 6 hours in an 8-hour workday; occasionally climb ramps and stairs; and never climb ladders/ropes/scaffolds.  (Tr. 276-77).  Dr. McCloud limited plaintiff to only occasional handling with her left hand.  (Tr. 278).  As support for his conclusions, Dr. McCloud noted plaintiff's normal gait; hypesthesia; absence of deformities of the wrist joint or tenderness; negative straight leg raising; normal hand function; decreased grip strength on the left, plaintiff's non-dominant hand; normal range of motion throughout the body; and knee arthroscopy.  (Tr.

276).  Dr. McCloud disagreed with Dr. Sheridan's assessment limiting plaintiff to sedentary work, noting that plaintiff's "normal strength, normal ROM [range of motion] and normal gait" did not necessarily support such a finding.  (Tr. 281).  Another state agency consultant, Dr. Gerald Klyop, M.D., affirmed Dr. McCloud's assessment in March 2008.  (Tr. 274).

Dr. Caldwell referred plaintiff to hand surgeon Thomas Kiefhaber, M.D., in November 2007.  An EMG/nerve conduction study of plaintiff's right hand revealed mild abnormalities and no evidence of denervation or radiculopathy.  (Tr. 296-97).  Dr. Kiefhaber examined plaintiff on November 20, 2007.  (Tr. 244-45, 294-95).  Plaintiff complained of numbness and tingling in both hands, which had been present for the prior six months.  She had numbness throughout the day and dyesthesias at night despite the fact that she had been wearing splints.  Dr. Kiefhaber observed that her sensory exam was abnormal and Phalen's test was positive bilaterally.  Dr. Kiefhaber diagnosed plaintiff with bilateral carpal tunnel syndrome.  Plaintiff stated that she would like to proceed with a left carpal tunnel release of the left hand, which was most symptomatic.  Dr. Kiefhaber noted that she could work without restrictions in the meantime.  (Tr. 293).

Dr. Kiefhaber performed a carpal tunnel release of plaintiff's left hand on January 7, 2008.  (Tr. 291-92).  On January 21, 2008, Dr. Kiefhaber reported that plaintiff's numbness and tingling had resolved.  (Tr. 290).  He estimated she could return to work without restrictions on February 18, 2008, and she could return to work immediately with the restriction that she avoid lifting more than 20 pounds.  (Tr. 289).

The record contains treatment notes from Marc Alexander, M.D., a physician with Western Hills Internal Medicine, dated September 2008 through February 2010.  (Tr. 342-96,

15

493-515). Dr. Alexander treated plaintiff for hypothyroidism, back pain, right knee pain, hypertension, high cholesterol, depression, insomnia, carpal tunnel syndrome, right foot pain, and diabetes. (*Id.*). Examination in January 2009 showed no pain upon movement and full range of motion in the knees. There was localized tenderness of the sacroiliac joint but no pain on movement of the spine. (Tr. 368). X-rays of plaintiff's hips taken on January 22, 2009, showed mild degenerative changes in both hips, slightly worse on the left. (Tr. 308). In March 2009, Dr. Alexander observed that plaintiff had a normal gait, normal reflexes, and there was no tenderness on palpation of the spine and other muscle groups. There was tenderness over the lumbar and sacral vertebra. Right knee examination showed that both flexion and extension were painful, and there was tenderness and crepitus. (Tr. 358). In August 2009, plaintiff complained of knee and lower back pain. (Tr. 348-49). Plaintiff complained that the onset of pain had been sudden and had been recurring in an intermittent pattern for about one month in the lumbosacral area. Upon examination, her upper and lower extremities were entirely normal, and she was able to toe and heel walk. Plaintiff had decreased range of motion in her hips. Dr. Alexander prescribed pain medication. An MRI of the lumbar spine taken on August 17, 2009, showed a broad disc bulge without nerve root impingement at L4-5 and mild degenerative arthritis at the right L5-S1 facet joint. (Tr. 305, 384).

On October 8, 2009, Dr. Alexander completed an RFC assessment. (Tr. 283-86). He opined that plaintiff can lift 10 pounds occasionally and five pounds frequently; stand/walk two hours in an 8-hour workday, and up to an hour without interruption; and sit up to eight hours in an 8-hour workday, and up to four hours without interruption. He also opined that plaintiff could occasionally climb, balance and stoop. Dr. Alexander indicated that plaintiff's ability to reach

16

and push/pull would be affected, but not her ability to handle, finger and feel. Dr. Alexander also opined that plaintiff would be precluded from working around heights, moving machinery, and temperature extremes, and pain medications may affect her endurance. The only medical finding Dr. Alexander provided in support of his assessment was "back pain." (Tr. 284-286).

Dr. Theresa Aurand, M.D., from Western Hills Internal Medicine completed a Basic Medical form for the Ohio Department of Job and Family Services after last examining plaintiff in May or June of 2009. (Tr. 447-449). Dr. Aurand opined that plaintiff can stand/walk for one hour without interruption and for two hours in an 8-hour workday; sit 25 minutes without interruption and a total of eight hours in an 8-hour workday, although the total varies; and lift/carry up to 10 pounds frequently. She opined that plaintiff's ability to push, pull, bend, reach, and handle is extremely limited and her ability to perform repetitive foot movements is moderately limited. She reported that any twisting of the back, including reaching, bending, stooping, and squatting, and transfer out of the chair to the table induces pain. Dr. Aurand's findings included decreased sensation and slight weakness in the right lateral thigh and pain in the right paralumbar muscles and right sacroiliac region. On physical exam, plaintiff had swelling and effusion in the right knee, crepitus, and medial tenderness. Dr. Aurand reported that plaintiff favors her right knee when walking and she uses a cane for support at times. Dr. Aurand noted that plaintiff's health status was "good/stable with [treatment]." (Tr. 450). Dr. Aurand concluded that plaintiff would be unemployable for 12 months or more.

Plaintiff saw Dr. Vickers for the first time in nearly two years on February 10, 2009, with two new complaints: (1) pain in the dorsal aspect of her right midfoot, which increased with activity and improved with rest, and an occasional lump in the area, and (2) right knee pain.

17

Examination of the foot revealed some mild edema in the dorsal midfoot with nonspecific tenderness to palpation. (Tr. 468). There was no discrete mass or cystic fluid collection, and the foot was neurovascularly intact. X-rays of the foot revealed mild degenerative change. Plaintiff had fallen on her right knee several times after slipping on the ice and felt nonspecific pain, particularly with ambulation. Examination of the knee revealed no significant warmth, swelling, erythema, ecchymosis, or effusion. Range of motion was full. Plaintiff had nonspecific tenderness about the anterior knee and mild crepitation. There was no ligamentous instability. McMurray test was negative. X-rays of the knee revealed moderate tricompartmental degenerative changes. Dr. Vickers diagnosed plaintiff's knee pain as an exacerbation of underlying osteoarthritis of the knee and injected steroids.

Plaintiff was seen by Rodney Roof, DPM, in December 2009, for a cyst of the lateral right foot. Examination revealed 5/5 strength on the muscle function exam and full sensation. (Tr. 461-62).

**B. Mental Impairments**

In September 2007, Dr. Caldwell reported that plaintiff suffered from hyperactivity, difficulty sleeping, depression, and low frustration tolerance, and she had difficulty tolerating close supervision. (Tr. 247). Dr. Caldwell further noted that plaintiff has been treated for her bipolar disorder since 2007. Dr. Caldwell opined that plaintiff was unable to work.

On October 29, 2007, plaintiff was examined by consultative psychologist Norman Berg, Ph.D. (Tr. 226-32). Plaintiff reported that she applied for disability benefits because she "can't hold a job and after three to six months, I lose the job . . ." (Tr. 226). Plaintiff reported her moods alternated between happy and sad and that she had been diagnosed as bipolar. Plaintiff

18

reported some of her medication helped calm her down and relaxed her, and specifically that

Risperdal helped clarify her thought processes. She reported that she did not currently use drugs

or alcohol. Plaintiff reported that she was currently receiving mental health treatment, which

included counseling and medication. Plaintiff described getting laid off from a series of jobs

because she was missing work at times and crying at work due to feeling depressed; she had

conflicts with others at work; and she stole from an employer. She reported that she was able to

use proper judgment in making decisions and that she experienced some anxiety, mood swings,

and depression. Dr. Berg observed that plaintiff had relevant, coherent, clear, and goal-directed

speech. However, she occasionally spoke in a loud or pressured manner and was occasionally

circumstantial, which seemed to be due to anxiety. (Tr 229). Dr. Berg observed that plaintiff

appeared moderately depressed as noted by her self-report and facial expression. Cognitively,

she functioned in a moderate to moderately slow manner. She cried at times during the interview

and at times seemed slightly agitated. It appeared to Dr. Berg that plaintiff had been

experiencing both manic and depressive episodes. Dr. Berg observed she had labile affect. She

had no psychotic or paranoid symptoms. Dr. Berg determined that plaintiff was of average

intelligence, and she had fair memory, a fair ability to concentrate, and good insight. (Tr. 229).

Plaintiff reported that she was able to attend to self-care and hygiene needs, although she

reported that she sometimes had difficulty with these activities because of physical pain, and she

stated that she cooked, cleaned, did laundry, and went grocery shopping. (Tr. 230). Plaintiff

stated that she liked to walk in the park, that she drove her son to and from school, and that she

would be joining a gym soon. She stated she had friends who occasionally call and visit and two

friends she had contact with. Dr. Berg diagnosed plaintiff with moderately severe bipolar

disorder, and assigned her a Global Assessment of Functioning (GAF) score of 55[2]. (Tr. 230-31). Dr. Berg concluded that plaintiff would have no limitations in her ability to understand or follow simple verbal directions; she had mild limitations in her ability to maintain attention and concentration while doing work-related tasks; she would have moderate limitations in her ability to maintain her level of activity in a work setting; she had moderate limitations in her ability to relate adequately with others in a work setting; she would have moderate limitations in her ability to cope with routine job stress; and her labile affect would interfere with her interacting with others.

On November 14, 2007, state agency reviewing psychologist, Kristen Haskins, Psy.D. completed a Psychiatric Review Technique and a Mental RFC Assessment. (Tr. 256-273). In the Psychiatric Review Technique, Dr. Haskins rated plaintiff's degrees of functional limitation resulting from bipolar disorder as follows: moderate restriction in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of an extended duration. (Tr. 259, 266). In the Mental RFC Assessment, Dr. Haskins found that plaintiff was moderately limited in the ability to understand, remember, and carry out detailed instructions; moderately limited in the ability to maintain attention and concentration for extended periods; moderately

---

[2]A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. The DSM-IV categorizes individuals with scores of 41 to 50 as having "serious" symptoms. *Id.* at 32. Individuals with scores of 51-60 are classified as having "moderate" symptoms. (*Id.*). Individuals with scores of 61-70 are classified as having "some mild" symptoms and "generally functioning pretty well." *Id.*

limited in the ability to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; moderately limited in the ability to interact appropriately with the general public; moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors; and moderately limited in the ability to respond appropriately to changes in the work setting. (Tr. 270-71). Dr. Haskins found that plaintiff's statements were credible and were supported by the objective medical evidence. Dr. Haskins accepted the consultative examiner's findings. Dr. Haskins noted that the consultative examiner opined that plaintiff is capable of simple, routine tasks. Dr. Haskins concluded that plaintiff would likely have difficulty with complex tasks and she would benefit from "a workplace with limited/superficial interactions with the general public, coworkers and supervisors" and "a relatively static/stable workplace without strict quota/production/pace requirements." (Tr. 272). Marianne Collins, Ph.D., affirmed Dr. Haskins' assessment in March 2008. (Tr. 255).

Plaintiff went to the Emergency Department at University Hospital on August 19, 2008. (Tr. 411-18). She was diagnosed with bipolar affective disorder, type I, with psychosis. Plaintiff reported that she had a history of crack usage but had not used crack for three months. Abnormal findings included difficulty processing words and paranoia. Plaintiff was prescribed medication but was not hospitalized because she did not meet the criteria for hospitalization.

Plaintiff attended three sessions of individual therapy at Centerpoint Health Services for depression and alcohol abuse, in remission, from March through May 2009. (Tr. 485-491). Plaintiff initially reported that she was having trouble remembering things, she was very depressed, she could not sleep, and she had some auditory hallucinations. Plaintiff was

21

diagnosed with major depressive disorder, recurrent episode, severe specified as with psychotic behavior, and polysubstance dependence (in remission). She was assigned a GAF score of 45. She was discharged from therapy in June after having made no progress due to the infrequency of her visits.

On August 3, 2009, plaintiff began treatment at Central Clinic and treated with a therapist there through December 2009. (Tr. 424-435, 453-59). Initially, plaintiff cried many times and spoke about her worthlessness and hopelessness. Plaintiff reported having difficulty sleeping and low energy. Plaintiff also reported that her depression had lasted for more than two years and had caused significant impairment in her social and occupational functioning. She reported being socially isolated as she had only one good friend and her siblings did not communicate with her. Plaintiff was diagnosed with dysthymic disorder and assigned a GAF of 55.

Plaintiff has been treated by Kode Murthy, M.D., since September 2009 with medication and therapy for depression, anxiety, and racing thoughts. (Tr. 444-45, 465).

In November 2009, an individual from Western Hills Internal Medicine completed a mental work assessment indicating that plaintiff would have a "fair" ability in 20 categories regarding occupational, performance, and social adjustment. (Tr. 397-400). The signature on the form is not legible.

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified at the administrative hearing that she is 5'4" tall and she weighed 230 pounds. (Tr. 31-32). Plaintiff lives in an apartment with her 14 year old son. (Tr. 32). She can read and write and do simple arithmetic. (Tr. 32-33). Her last job at Chester Labs ended in 2006 or 2007 when she was fired for having an outburst toward a supervisor. (Tr. 34-35). Plaintiff testified that she had "some issues" at that job with harassment from a supervisor and that she was paranoid about some of her coworkers. (Tr. 34). She worked at Cincinnati Lube for three months in 2006 before she was fired for stealing. (Tr. 35-36).

Plaintiff testified that she cannot work due to pain in her neck and low back, carpal tunnel syndrome in the right hand, and right knee pain. (Tr. 40). Plaintiff testified she sometimes uses a cane, depending on the severity of her knee pain. (*Id.*). She testified that she has pain across the back of her neck which radiates into her back and sometimes causes her to have trouble turning her head. (Tr. 40-41). She cannot lift more than five pounds. (Tr. 44). She testified that she has a tendency to drop something weighing over five pounds because her hands "crunch up" from her carpal tunnel syndrome. (*Id.*). Plaintiff estimated that she can walk a half block to one block, but walking two or three blocks causes tremendous pain in her neck and lower back. (Tr. 45). Plaintiff further testified that she has trouble bending and difficulty climbing, but she is able to reach. She can manage the four steps at her house. (*Id.*). She estimated that she can only stand 15 minutes at a time before her neck and back start hurting and she can sit only 20-25 minutes due to back pain. (Tr. 45). Plaintiff takes Oxycodone for pain. (Tr. 42).

Plaintiff testified that she is very depressed and has been depressed at least two to three

23

years. (Tr. 46). She stated she is paranoid and thinks that people are closing in on her, but her medication, Seroquel, helps a little bit. (*Id.*). She has had hallucinations and delusions, but the Seroquel also helped with that. (*Id.*). She used to like to read and go bowling, but she lost interest in these activities because it is hard for her to focus due to racing thoughts. (*Id.*). Plaintiff also testified that some days when she is really depressed, she will not get out of bed and cook or eat anything. (Tr. 47). She has trouble sleeping, although Seroquel and Valium help. (*Id.*). Plaintiff testified that she has a low energy level, very low self-esteem, trouble concentrating on things, and problems with her memory. (*Id.*). She reported having crying spells at least two or three times a week. (Tr. 48). Plaintiff used to spend time with her mother, but she now has Alzheimers disease. (*Id.*). Plaintiff does not have any family she sees and only one friend she sees occasionally. (Tr. 49).

Plaintiff testified that she has been sober for 2 or 3 years. (*Id.*). She smokes at least half a pack of cigarettes per day. (Tr. 49-50). Plaintiff testified that she stays in her room at least three days a week because she is depressed. (Tr. 55). She will not leave the house because she does not want to interact with others. (Tr. 55-56). Plaintiff testified that if she is not depressed, she may get up and do some light housework. (Tr. 50). She testified that she usually stays in her apartment except to go to the doctor or the grocery store. (Tr. 49). She also testified that she goes shopping with her son, makes meals, watches TV, and does household chores on a regular basis with help from her son. (Tr. 50-52).

Plaintiff testified that seeing the psychiatrist and getting medication helped her quite a bit. (Tr. 57). She testified that she stopped going to Center Point for treatment because she never got to see the psychiatrist and she would be so depressed she could not get out of bed. (*Id.*). She

24

testified that she would be in bed more than three days a week before she stated seeing the psychiatrist. (*Id*.). Plaintiff currently sees a psychiatrist, Dr. Murthy, for her bipolar disorder and depression. (Tr. 41).

## OPINION

Plaintiff presents three assignments of error in this case. First, plaintiff argues the ALJ's determination of the weight to assign the various medical opinions is not reasonable and is not supported by the evidence. Specifically, plaintiff contends that the ALJ failed to adequately articulate the reasons why he rejected the RFC assessment of Dr. Alexander; he erred by rejecting the RFC opinions of Drs. Alexander and Sheridan; and he failed to accord proper weight to the opinions assessing plaintiff's psychological impairments. Second, plaintiff contends that the ALJ did not properly account for all of her impairments in the RFC. Plaintiff argues that the ALJ should have restricted her to no overhead reaching; limited handling/fingering; and a five-pound lifting limitation. Third, plaintiff argues the ALJ erred by improperly assessing her credibility.

## I. The ALJ did not err in determining the weight to accord the medical sources' opinions as to her physical impairments

The ALJ found that there were no "credible medical opinions supporting [plaintiff's] limitations." (Tr. 18). The ALJ decided to give "some weight" to Dr. Sheridan's assessment, but the ALJ rejected his finding that plaintiff was restricted to sedentary work on the ground that this assessment was premised on the assumption that plaintiff had bilateral carpal tunnel syndrome. (*Id*., citing Tr. 233-243). The ALJ found the opinion of plaintiff's hand surgeon, Dr. Kiefhaber, that plaintiff could return to work on January 21, 2008, with a restriction of lifting no more than 20 pounds with the injured hand and with no restrictions as of February 18, 2008, was entitled to

"significant weight." (Tr. 18-19, citing Tr. 287-300). The ALJ rejected the assessment of plaintiff's treating physician, Dr. Alexander, that plaintiff has an RFC consistent with sedentary work on the ground that the assessment was not consistent with Dr. Alexander's own findings. (Tr. 19, citing Tr. 283-86, 446-51).

Plaintiff claims that the ALJ erred by finding there were no "credible medical opinions" to support her limitations. (Doc. 13 at 11). Plaintiff asserts that the opinion of her treating physician, Dr. Alexander, limiting her to sedentary work is entitled to controlling weight, and the ALJ's decision to reject his opinion is not supported by the evidence. Plaintiff argues that Dr. Alexander was in a better position to give an opinion as to her RFC than were the one-time examining physicians who assessed plaintiff in 2007. Plaintiff claims that unlike the consultative examining physicians, Dr. Alexander had an opportunity to consider a larger portion of the record and had access to MRI and EMG reports. Plaintiff further alleges that Dr. Alexander's opinions are consistent with the test results and with his own objective findings, including tenderness of the paravertebral muscles; decreased range of motion of the lumbar spine and right knee; and swelling and crepitus of the right knee. (Doc. 13 at 9, citing Tr. 348-351, 357-358, 361, 367-68, 448, 497), as well as the objective findings of other providers. (*Id.* at 9-10, citing Tr. 244, 247, 405, 439, 461-62, 468-70, 476, 514-15).

Plaintiff further claims that the ALJ erred by giving greater weight to the decision of Dr. Kiefhaber than he accorded the decision of the consultative examining physician, Dr. Sheridan, whose opinion she claims is consistent with the medical evidence. Plaintiff asserts that Dr. Kiefhaber was addressing only plaintiff's carpal tunnel syndrome and did not take into account plaintiff's other impairments, whereas it is clear that Dr. Sheridan also took into account

plaintiff's history of right knee surgery and a 50% squatting limitation.  (Doc. 13 at 11-12, citing Tr. 239).

The Commissioner argues that the ALJ properly discounted Dr. Alexander's assessments because they were conclusory, they were devoid of proper support, and they were inconsistent with each other, with his own treatment notes, and with the rest of the record.  (Doc. 19 at 13-15).  The Commissioner further contends that substantial evidence supports the ALJ's decision to give significant weight to the opinion of Dr. Kiefhaber and to reject the opinion of Dr. Sheridan restricting plaintiff to lifting 10 pounds because Dr. Kiefhaber, as plaintiff's hand surgeon, was in the best position to recommend lifting and handling restrictions.  (*Id*. at 18-20).

The ALJ's decision as to the weight to accord the opinions of Drs. Alexander, Sheridan and Kiefhaber is supported by substantial evidence.  First, the ALJ did not err by failing to give controlling weight to the assessment of plaintiff's treating physician, Dr. Alexander.  Plaintiff alleges that the ALJ did not articulate what weight, if any, he gave to Dr. Alexander's opinion and the ALJ did not explain his reasons for failing to rely on Dr. Alexander's opinion.  Contrary to plaintiff's assertions, the ALJ made clear that he was rejecting Dr. Alexander's assessments to the extent Dr. Alexander found plaintiff was limited to performing sedentary work because Dr. Alexander's opinion was neither consistent with, nor supported by, his own findings.  (Tr. 19). The ALJ's decision to disregard Dr. Alexander's opinion on this basis is supported by substantial evidence.  The ALJ noted that as of August 2009, plaintiff's neurological examination showed normal and intact functioning and virtually the only positive finding was decreased range of motion of the right hip.  (*Id*., citing 348-349).  The ALJ further found that an examination in December 2009 did not show even that positive finding.  (*Id*., citing Tr. 500-01).  Moreover,

27

while the ALJ acknowledged positive findings of painful flexion and extension of the spine and tenderness over the lumbar vertebra and sacral vertebra made by Dr. Aurand of Western Hills Internal Medicine in January 2010 (*Id.*, citing Tr. 497), the ALJ reasonably determined that it could not be concluded from the record as a whole that plaintiff had symptoms that would include greater limitations than those included in the RFC.  (*Id.*).  The ALJ's conclusion is supported by the negative findings Dr. Aurand made on physical examination in January 2010, including a normal musculoskeletal exam and a normal and intact neurologic exam with no obvious focal, motor or sensory deficits; symmetric and equal reflexes; and a normal gait.  (Tr. 497).  *See Jones v. Secretary, Health and Human Services*, 945 F.2d 1365, 1369-1370 (6th Cir. 1991) (objective medical evidence such as muscle atrophy, reduced joint motion, muscle spasms, and sensory and motor disruption are usually  "reliable indicators" of the intensity and severity of pain).

Plaintiff further alleges that the ALJ erred by failing to afford Dr. Alexander's opinion controlling weight because his opinion is consistent with the objective findings of the other providers.  Plaintiff does not point to any specific evidence to support her argument but generally cites a number of transcript pages.  The Court has reviewed the cited portions of the transcript. These records, viewed as a whole, do not support the extensive limitations imposed by Dr. Alexander based on his limited medical findings.[3]  (See Tr. 405, 439, 461-62, 514-15-treatment for a foot cyst; Tr. 244-Dr. Kiefhaber's 2007 notes predating plaintiff's carpal tunnel surgery;

---

[3]The only "medical finding" Dr. Alexander cited in the October 8, 2009 Medical RFC Assessment to support the functional limitations he assessed was "back pain." (Tr. 284-286).  The following month, Dr. Alexander adopted the much more restrictive RCF assessment completed by Dr. Aurand, which included some additional medical findings. (Tr. 447-450). However, those findings were relatively mild, and Dr. Alexander did not explain how they supported greater restrictions than he had imposed a month earlier.

Tr. 247-Dr. Caldwell's mental limitations assessment; Tr. 468-470, 476-2007/2009 physician and physical therapist notes pertaining to plaintiff's knee).  Moreover, Dr. Alexander's assessments are inconsistent with the findings of Dr. Sheridan pertaining to plaintiff's back.  On physical examination, Dr. Sheridan found full range of motion; a normal gait; negative straight leg raising; no motor deficits; and no muscle spasm.  (Tr. 234-239).

Thus, the ALJ was entitled to reject Dr. Alexander's opinion concerning the extent of plaintiff's disability as unsupported by his own findings and as inconsistent with other substantial evidence in the record.  *See Harris*, 756 F.2d at 435 ("The determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician.").  *See also Blakley*, 581 F.3d at 406 (if a treating physician's opinion as to the severity of the claimant's impairments is not well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not consistent with the other substantial evidence in the case, the opinion is not entitled to controlling weight.)  *See also* 20 C.F.R. § 416.927(d)(2);  *Warner v. Commissioner of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (citing *Jones v. Commissioner of Social Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (treating physicians' opinions are only given substantial deference when supported by objective medical evidence).

The ALJ's decision to give only some weight to the assessment of Dr. Sheridan is likewise supported by substantial evidence.  Plaintiff alleges that the ALJ erred in this regard because Dr. Kiefhaber's opinion was based only on plaintiff's carpal tunnel syndrome, whereas Dr. Sheridan took into account all of plaintiff's impairments in limiting her to sedentary work. Plaintiff alleges it is apparent Dr. Sheridan did so because diagnostic tests for carpal tunnel syndrome which he performed produced negative results, and he took into account her history of

29

right knee surgery and her limited squatting ability. However, it is apparent from Dr. Sheridan's discussion and opinion that his RFC assessment limiting plaintiff to sedentary work is premised on the assumption she had carpal tunnel syndrome. (Tr. 239). Moreover, plaintiff has not pointed to any findings made by Dr. Sheridan on physical examination other than the potential carpal tunnel syndrome diagnosis which would limit her to sedentary work. Because plaintiff underwent carpal tunnel surgery following Dr. Sheridan's assessment, the ALJ was entitled to rely on the opinion of plaintiff's hand surgeon, Dr. Kiefhaber, regarding plaintiff's handling and lifting restrictions after surgery, which resolved plaintiff's symptoms on the left side. (Tr. 290). Thus, the ALJ did not err by according "significant weight" to Dr. Kiefhaber's opinion assessing "the use of [plaintiff's] upper extremies in particular." (Tr. 18-19). *See* 20 C.F.R. § 416.927(d)(5) (more weight is generally given to the opinion of a specialist about medical issues related to his area of specialty than to the opinion of a source who is not a specialist).

Plaintiff also claims that the ALJ erred by deciding to accord only "some weight" to the opinions of two physicians who purportedly treated him and who gave opinions concerning the limitations imposed by her psychological limitations. These are: (1) an opinion rendered by Dr. Caldwell in 2007 that plaintiff's poor stress tolerance and difficulty dealing with close supervision would make her unable to work (Tr. 246-248); and (2) a Medical Assessment of Ability to Do Work-Related Activities, which plaintiff alleges was completed by a physician at Western Hills Internal Medicine. (Tr. 397-400). Plaintiff asserts that the findings of Dr. Caldwell and the unidentified physician are consistent with the other evidence of record documenting her mental limitations. Plaintiff also claims that the Social Security Regulations do not permit the ALJ to reject a treating family physician's opinion about a claimant's mental

30

impairment solely on the ground that the physician is not a psychiatrist. (Doc. 13 at 10-11).

The Commissioner claims that the ALJ's decision as to the weight to give the psychological assessments is supported by substantial evidence. The Commissioner notes that the signature on the assessment completed by the source with Western Hills Internal Medicine is illegible, so it is not clear whether the form was filled out by a doctor from that group. In addition, the Commissioner contends that the opinion is not entitled to significant weight because there are no supporting explanations or documentation for the conclusion on the form. The Commissioner claims that the ALJ implicitly gave no weight to Dr. Caldwell's assessment that plaintiff is unable to work but contends that the ALJ was justified in rejecting her conclusion because the determination of disability is ultimately the Commissioner's prerogative. The Commissioner also contends that Dr. Caldwell's responses were inconsistent with the medical record as a whole, and the answers she provided were conclusory and lacked support. The Commissioner claims that Dr. Caldwell's assessment was so patently deficient that a reasonable ALJ could not possibly credit it. (Doc. 19 at 15-16).

The ALJ determined to give "great weight" to the opinion of the state agency reviewing psychologist Dr. Haskins and to give "significant weight" to the evaluation of the consultative examining psychologist Dr. Berg. (Tr. 16, 19). The ALJ decided to give "some weight" to the opinion completed by the source at Western Hills Internal Medicine, noting that there was no indication the assessment was made by a mental health professional. (Tr. 19). The ALJ did not discuss Dr. Caldwell's assessment, but the ALJ implicitly rejected Dr. Caldwell's opinion by finding plaintiff was not disabled.

The ALJ's decision as to the weight to accord these opinions is supported by substantial

31

evidence. First, Dr. Caldwell, plaintiff's family physician, made only cryptic and conclusory notations concerning plaintiff's mental limitations and provided no supporting objective or clinical findings. (Tr. 247-248). Nor do any of Dr. Caldwell's progress notes document any findings or treatment related to bipolar disorder. (Tr. 246-254, 438-442). Dr. Caldwell's conclusory opinion that plaintiff is unable to work is not entitled to any deference. *See Harris*, 756 F.2d at 435 ("The determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician."). Moreover, Dr. Caldwell's opinion is so patently deficient that the ALJ's failure to discuss it does not warrant reversal of his decision. *See Wilson*, 378 F.3d at 547 ("[I]f a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it, a failure to observe 20 C.F.R. §404.1527(d)(2) may not warrant reversal.").

Furthermore, the ALJ was not bound to give greater weight than he did to the opinion of the source from Western Hills Internal Medicine concerning plaintiff's mental limitations. (Tr. 398-400). First, as the ALJ correctly noted, there is no indication that the form was completed by a mental health professional, and the ALJ was entitled to give the assessment less weight than that accorded to the opinions of the treating and examining psychologists on this basis. *See* 20 C.F.R. § 416.927(d)(5) (more weight is generally given to opinion of a specialist about medical issues related to area of specialty than to opinion of source who is not a specialist). Second, there is no indication on the form that a physician who had regular contact with plaintiff completed the form. Thus, the assessment is not entitled to the weight generally accorded the weight of a treating source. Third, there are no clinical or objective findings to support the mental limitations noted on the form. Thus, the ALJ's decision as to the weight to accord the

32

assessment is supported by substantial evidence.  Plaintiff's second assignment of error should not be sustained.

## II.     The ALJ did not err by failing to account for all of plaintiff's impairments in the RFC

Plaintiff alleges that the ALJ erred by failing to include limitations on the use of her hands and arms in the RFC.  Plaintiff claims that the ALJ failed to take into account (1) untreated carpal tunnel syndrome in her dominant right hand, and (2) cervical radiculopathy in the left upper extremity, as documented by the EMG and the cervical MRI findings of disc disease causing encroachment upon the spinal cord.  (Doc. 13 at 12, citing Tr. 251-254).  Plaintiff claims her ability to reach overhead is limited by her cervical radiculopathy.  (Doc. 13 at 12-13). Plaintiff also claims that her carpal tunnel syndrome limits her handling and fingering ability and restricts her to lifting five pounds.  (Doc. 13 at 12).

The Commissioner argues that the objective medical evidence supports the ALJ's decision to give significant weight to Dr. Kiefhaber, a specialist, regarding plaintiff's lifting and handling restrictions.  The Commissioner contends that plaintiff is unable to point to evidence of continued complaints of hand or wrist pain which suggest she requires handling or lifting restrictions.

Plaintiff has not shown that the ALJ erred by failing to include in the RFC limitations on reaching, handling/fingering, and lifting.  Plaintiff points to only her own testimony at the ALJ hearing to demonstrate that she has a five-pound lifting restriction.  (Doc. 13 at 12, citing Tr. 44). This is insufficient.  *See* 42 U.S.C. § 423(d)(5)(A) (subjective complaints of "pain or other symptoms shall not alone be conclusive evidence of disability").  Moreover, Dr. Kiefhaber did

33

not impose any lifting restrictions as of February 18, 2008, following plaintiff's carpal tunnel surgery on her left hand despite his knowledge of "some carpal tunnel syndrome on the right." (Tr. 289-290). Plaintiff has not cited any contrary evidence in the record to show that carpal tunnel syndrome in her right hand has restricted her ability to lift subsequent to that date. Moreover, when asked at the ALJ hearing whether she was able to reach, plaintiff answered that she "can reach things" depending on how far they are, and she did not testify that she had any difficulties reaching overhead. (Tr. 45). Plaintiff's second assignment of error should not be sustained.

**III.    The ALJ erred by improperly assessing plaintiff's credibility**

The ALJ determined that plaintiff was not credible because although her impairments could reasonably be expected to cause the alleged symptoms, plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms are not credible to the extent they are inconsistent with the RFC assessment. (Tr. 18). The ALJ determined that the physical findings have been "relatively benign," and there are no credible medical opinions supporting her limitations. (*Id.*). The ALJ further determined that (1) plaintiff's mental impairments have not been significant enough to require hospitalization (*Id.*, citing Tr. 301-341); (2) plaintiff was discharged from therapy for noncompliance (*Id.*, citing Tr. 480); (3) the record does not document plaintiff's alleged hallucinations; (4) plaintiff used crack after her alleged onset date, which did not enhance her mental functioning (*Id.*, citing Tr. 411-18); and (5) there are no unbiased third-party statements supporting plaintiff's allegations. (*Id.*).

Plaintiff claims that the ALJ erred by improperly assessing her credibility because (1) the ALJ used boilerplate language and failed to cite specific exhibits or page numbers to support his

34

finding, and (2) the ALJ did not consider the non-medical questionnaire completed by plaintiff's sister for the improper reason that he considered her to be biased.  (Doc. 13 at 13-15).

The Commissioner argues that the ALJ's decision shows he considered the relevant factors and properly determined that plaintiff was not entirely credible.  The Commissioner claims the ALJ discussed plaintiff's ability to engage in certain daily activities; her testimony regarding her pain; her medications; her treatment history; the relatively benign clinical and objective findings; plaintiff's failure to comply with physical therapy and mental health counseling; the fact that plaintiff was never hospitalized for her mental illness; and the fact that plaintiff used illegal drugs after her alleged onset date.  (Doc. 19 at 20-21).  In addition, the Commissioner argues that the ALJ was free to disregard the third-party statement provided by plaintiff's sister without providing his reasons for doing so.  (Doc. 19 at 21-22).

In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *Kirk*, 667 F.2d at 538.  "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.  The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

Social Security Regulation 96-7p describes the requirements by which the ALJ must abide in rendering a credibility determination:

> It is not sufficient for the adjudicator to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain *specific reasons* for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

(emphasis added).  The ALJ's credibility decision must also include consideration of the following factors: 1) the individual's daily activities; 2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and 7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* 20 C.F.R. § 404.1529(c); SSR 96-7p.

Here, the ALJ failed to consider the relevant factors for assessing plaintiff's credibility as required under the governing authorities set forth above.  The ALJ failed to consider whether plaintiff's daily activities are inconsistent with her complaints of disabling symptoms; any factors that aggravate her symptoms; and the extensive treatment plaintiff has received for her mental impairments.

Furthermore, the reasons the ALJ did offer for discounting plaintiff's complaints of

36

disabling psychological symptoms are either not clear or are they are not valid. The fact that plaintiff has never been hospitalized for her mental impairments is not a valid reason for discounting her credibility, particularly when the record is replete with medical evidence documenting plaintiff's serious mental impairments. (*See* Tr. 323-emergency room diagnosis of "acute anxiety/depression"; Tr. 230-diagnosis of "bipolar I disorder, most recent episode mixed, moderately severe" by the state agency examining psychologist; Tr. 309-310-extensive notes by emergency room physician commenting on plaintiff's "somewhat unusual affect"; Tr. 415-diagnosis of bipolar affective disorder I psychosis/paranoid personality at University Hospital Department of Psychiatry emergency room and notations that plaintiff was tangential; she had difficulty finding and processing words; and she had increased paranoia and suspicion people were "out to get her"; Tr. 484-diagnosis of "major depressive disorder, recurrent episode, severe, specified as with psychotic behavior"; Tr. 469-observations by Dr. Vickers on plaintiff's mental state and notation that plaintiff was very tearful and upset for reasons unrelated to her knee impairment; Tr. 351-Dr. Aurand office notes commenting that plaintiff was somewhat tangential at time in responses, she was labile, she cried at times, she switched subjects often, and her speech was sometimes pressured; Tr. 432-Central Clinic observations on plaintiff's depressed state; Tr. 455, 457-Central Clinic notes that plaintiff had low affect and depressed mood; Tr. 444-445, 465-September-October 2009 treatment notes by psychiatrist Dr. Kode Murthy noting problems with depression, anxiety, racing thoughts). Contrary to the ALJ's finding, the record also documents plaintiff's reports of hallucinations. (Tr. 485- plaintiff reported some auditory hallucinations in March 2009; Tr. 309-plaintiff reported at emergency room in August 2008 that she had been seen at University Hospital a few days earlier for hallucinations and was started on

37

Seroquel).

In addition, while the ALJ notes that plaintiff was discharged from therapy in June 2009 for missing too many appointments (Tr. 18, citing Tr. 480), he fails to note that she began therapy at another clinic shortly after her discharge and received continuing psychiatric treatment thereafter. (Tr. 424-435; 444-45; 453-59; 465). Moreover, although the ALJ would be entitled to discount plaintiff's credibility by pointing to any inconsistent representations she may have made regarding her illegal drug usage, it was not reasonable for the ALJ to discount her credibility based merely on the fact that she used illegal drugs at some point after the alleged disability onset date.[4]

Finally, it is not clear what the ALJ meant when he stated, "There are no unbiased third-party statements supporting [plaintiff's] allegations." (Tr. 18). The parties interpret the ALJ's statement to mean that he decided not to consider the third-party function report submitted by plaintiff's sister because he considered her to be biased (Tr. 193-200), and they dispute whether his finding is valid. However, it is not clear from the ALJ's statement whether he actually considered the third-party function report from plaintiff's sister. Thus, it is impossible to determine whether he was justified in rejecting the report on the ground of bias.[5] In any event, assuming the ALJ was referring to the third-party function report completed by plaintiff's sister, the ALJ was not entitled to rely on plaintiff's failure to submit a third-party statement from a

_____

[4] The ALJ relied on plaintiff's report to hospital personnel when seeking emergency psychiatric care in August 2008 that she had a history of crack usage but had been "clean" for three months. (Tr. 415).

[5] The ALJ was not entitled to reject the report as biased simply because it was completed by plaintiff's sister. The Social Security Regulations and Rulings allow for the consideration of evidence from "non-medical sources," including siblings, to show the severity of a claimant's impairments and how they affect the claimant's ability to work. 20 CFR §§ 404.1513(4); 416.913(d); SSR 06-03p.

source whom the ALJ considered to be unbiased to find plaintiff was less than credible.

Thus, the ALJ failed to consider the factors listed in 20 C.F.R. § 404.1529(c) and SSR 96-7p when assessing plaintiff's credibility. The ALJ instead relied on considerations that had no bearing on plaintiff's credibility. The ALJ's decision finding plaintiff is not disabled should be reversed on this ground.

## CONCLUSION

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043, 1990 WL 94 (6th Cir. Jan. 2, 1990). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Id. See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of

disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky*, 35 F.3d at 1041; *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

Here, the ALJ failed to assess plaintiff's credibility in accordance with the Social Security Regulations and Rulings and as required under Sixth Circuit law. A remand of this matter is therefore appropriate for a reassessment of plaintiff's credibility consistent with this decision.

**IT IS THEREFORE RECOMMENDED THAT:**

This case be **REVERSED** and **REMANDED** for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: _8/22/2011_

_Karen L. Litkovitz_

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

KIM TEEL,                                          Case No. 1:10-cv-613

      Plaintiff                                Beckwith, J.
                                                   Litkovitz, M.J.

    vs

COMMISSIONER OF
SOCIAL SECURITY,

      Defendant


## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to these proposed findings and recommendations within **FOURTEEN DAYS** after being served with this Report and Recommendation ("R&R"). That period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within **FOURTEEN DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).